| | |
|---|---|
| _____ ) | |
| CELSO VAZ GABRIEL d/b/a AURA ) | |
| VIDEO AND ADVERTISING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 13-12787-NMG |
| SUPERSTATION MEDIA, INC. and ) | |
| JOAQUIM CAVAIGNAC, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| SUPERSTATION MEDIA, INC. and ) | |
| JOAQUIM CAVAIGNAC, ) | |
| ) | |
| Third party plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| PATRICIA VAZ GABRIEL, ) | |
| ) | |
| Third party defendant. ) | |
| _____ ) | |

## MEMORANDUM & ORDER

**GORTON, J.**

This case arises out of the breakdown of a business relationship between an advertising broker and an advertising agent. Plaintiff Celso Vaz Gabriel ("Gabriel"), who conducts business as Aura Video and Advertising ("Aura"), filed the instant action against defendants Superstation Media, Inc. ("Superstation"), its president Joaquim Cavaignac ("Cavaignac") and TV Globo International Ltd. ("TV Globo") alleging that

Superstation and Cavaignac breached an implied contract and defamed him and that all three defendants committed various other torts against him.  Superstation and Cavaignac have denied the allegations, counterclaimed against plaintiff and filed a third party complaint against plaintiff's wife, Patricia Vaz Gabriel ("Ms. Gabriel").  TV Globo was dismissed from the case in February, 2014.

Pending before the Court are defendants' motion for summary judgment and motion to strike an affidavit filed in opposition to their motion for summary judgment.  For the reasons that follow, the motion for summary judgment will be allowed, in part, and denied, in part, and the motion to strike will be denied.

## I.   <u>Background</u>

Superstation is a corporation that sells advertising "air time" on TV Globo, a Brazilian television channel that broadcasts programming in Portuguese in the United States and elsewhere.  Superstation is the exclusive sales representative of TV Globo in the United States and Canada.

Superstation works with individuals, advertising agencies and video production companies that produce commercials for advertisers to be aired on TV Globo.  In order to broadcast an advertisement on TV Globo through Superstation, an advertiser must enter into a contract with Superstation and comply with its

policies and procedures.  For instance, it requires advertisers
to submit all payments for advertising time on TV Globo directly
to Superstation and to execute an agency representation letter
designating their advertising agency, if any.  After a
commercial airs on TV Globo, Superstation remits a standard
commission to the advertiser's authorized advertising agency.

Gabriel, doing business as Aura, is an advertising agent in
Massachusetts who produces advertisements for his clients, which
are mostly businesses that cater to the Portuguese-speaking,
Brazilian population of Massachusetts and New Hampshire.  For
clients seeking to advertise on TV Globo, plaintiff obtains
signed letters authorizing Aura to be their representative,
provides those letters to Superstation and negotiates
advertising plans on their behalf.

Although Superstation and Gabriel have had a business
relationship for many years, they are not party to an express
oral or written contract.  Nor has Superstation ever represented
to plaintiff that it would continue to do business with him for
any specific length of time.

 The relationship between the parties broke down in 2013
when Superstation allegedly learned that 1) Gabriel had been
demanding payments due to Superstation from his clients which he
then remitted to Superstation out of his personal account and 2)
Gabriel and his wife, third party defendant Patricia Vaz Gabriel

-3-

("Ms. Gabriel"), misrepresented to clients on multiple occasions that the clients are required to use Aura as their agent in order to advertise on TV Globo.

In August, 2013, Superstation's attorney sent a letter to Gabriel requesting that, in the future, plaintiff and his wife communicate with Superstation only by email and reminding them that they are not authorized to receive payments or act or speak on behalf of Superstation or TV Globo.

Later that month, Ms. Gabriel broadly disseminated an email to mutual clients of the parties and to the advertising market in which she accused Cavaignac of being dishonest and of committing crimes in his capacity as TV Globo's representative. The email stated that Cavaignac

> is a scammer and may attempt to create rumors in the market place, bluffing, and we want to inform our clients of what is going on....[He] acts in such a dishonest manner, unethically and without scruples... He makes use of TV Globo's name to carry out his schemes and, worse yet, involves his clients in them.

Plaintiff alleges that Cavaignac contacted several of Aura's clients in August or September, 2013 and offered them new advertising packages without plaintiff's permission. He also claims that Cavaignac slandered him in a deliberate attempt to induce or intimidate his clients into buying advertising packages directly from Superstation rather than through Aura. In particular, he alleges that Cavaignac told Aura's clients

that Gabriel was investing their payments in "speculative ventures." Cavaignac denies those allegations.

In September, 2013, Superstation's attorney notified plaintiff that Superstation and TV Globo would honor existing contracts but would enter into no new contracts with clients who were represented by Aura. The parties' mutual clients were notified that they could retain Aura to produce future commercials but that they would need to use another advertising agent to communicate with Superstation.

The parties do not dispute that Superstation has since honored all of its existing contracts with advertisers represented by Aura and has paid plaintiff all commissions owed on those contracts.

## II. **Procedural History**

Plaintiff filed his complaint in the Massachusetts Superior Court for Essex County in October, 2013 alleging that 1) Superstation breached an implied contract (Count I) and the derivative covenant of good faith and fair dealing (Count II), 2) Cavaignac defamed plaintiff by telling his clients that plaintiff misappropriated funds (Count III) and 3) all defendants were unjustly enriched by their misappropriation of Aura's client list (Count IV), intentionally interfered with Aura's contractual and advantageous business relationships (Count V) and engaged in unfair or deceptive business practices

-5-

in violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter 93A") (Count VI).

After defendants timely removed the case to this Court, plaintiff moved for a preliminary injunction against Superstation and Cavaignac and they, in turn, filed a counterclaim against Gabriel and a third party complaint against Ms. Gabriel, alleging defamation, intentional interference with contractual relationships and violations Chapter 93A.  TV Globo moved to dismiss the claims against it in December, 2013.

In February, 2014, the Court denied plaintiff's motion for preliminary injunction and allowed TV Globo's motion to dismiss. In February, 2015, Superstation and Cavaignac moved for summary judgment and shortly thereafter filed a motion to strike the affidavit of Moises Constantino Laurindo ("Mr. Laurindo") submitted in opposition to their motion for summary judgment.

## III. __Defendants' motion to strike__

Defendants move to strike the affidavit of Mr. Laurindo attached to plaintiff's opposition to defendants' motion for summary judgment pursuant to Rules 37 and 56 of the Federal Rules of Civil Procedure.

Defendants contend that the affidavit should be stricken under Rule 37 because Mr. Laurindo was not identified by plaintiff, either initially or in supplemental responses, as an

-6-

individual likely to have discoverable information. Fed. R. Civ.
P. 37(c)(1).

Defendants' argument is undermined, however, by a
stipulation between the parties at the deposition of Ms. Gabriel
in July, 2014.  At that deposition, the parties agreed that
plaintiff could amend his witness list to add Mr. Laurindo and
that both parties would have an opportunity to depose him.  The
fact that Mr. Laurindo was not disclosed in written discovery
cannot now serve as a basis for striking his affidavit because
defendants agreed to the belated amendment of plaintiff's
witness list even though they failed to take Mr. Laurindo's
deposition.

Defendants also contend that the affidavit is improper in
form, inaccurate with respect to at least one alleged fact and
overly vague and is therefore subject to striking under Rule 56
which requires that an affidavit

>be made on personal knowledge, set out facts that
>would be admissible in evidence, and show that the
>affiant or declarant is competent to testify on the
>matters stated.

Fed. R. Civ. P. 56(c)(4).

Although it is undisputed that the signing of the undated
affidavit of Mr. Laurindo was neither witnessed nor notorized,
Section 1746 of Title 28 of the United States Code allows for

"unsworn declarations under penalty of perjury" so long as the

declaration substantially comports with the following form:

> I declare (or certify, verify, or state) under penalty
> of perjury under the laws of the United States of
> America that the foregoing is true and correct.
> Executed on (date). (Signature).

28 U.S.C. § 1746(1). The affidavit of Mr. Laurindo states that

it was "[s]igned under the pains and penalties of perjury,"

which sufficiently comports with the statute.

> With respect to the failure to date the document,
>
> courts have held that the absence of a date on such
> documents does not render them invalid if extrinsic
> evidence could demonstrate the period when the
> document was signed.

Peters v. Lincoln Elec. Co., 285 F.3d 456, 475 (6th Cir. 2002).

The affidavit of Mr. Laurindo offers such extrinsic evidence

through what appears to be a fax machine transmission

confirmation line at the top of the signature page which

indicates that the page was faxed to Ms. Gabriel at 03:28 on

March 6, 2015.

Finally, although the Court agrees with defendants that the

content of the affidavit is somewhat vague with respect to who

was present at the alleged business meeting and the time frame

of the purported phone call from Cavaignac, the affidavit

nevertheless appears to be based upon personal knowledge of

conversations Mr. Laurindo had with Cavaignac and therefore

satisfies Rule 56.

Accordingly, defendants' motion to strike the affidavit of Mr. Laurindo will be denied.

## IV. <u>Defendants' motion for summary judgment</u>

### A.  **Legal standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>*,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting <u>Garside</u> v. <u>Osco Drug, Inc.</u>*,* 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>*,* 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>*,* 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all

reasonable inferences in that party's favor. <u>O'Connor</u> v.
<u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is
appropriate if, after viewing the record in the non-moving
party's favor, the Court determines that no genuine issue of
material fact exists and that the moving party is entitled to
judgment as a matter of law.

**B.   Application**

**1.   Breach of implied contract (Count I)**

It is undisputed that there was no express oral or written
agreement between the parties. Plaintiff contends, however,
that an implied contract existed and that Superstation breached
that contract by 1) terminating their business relationship in
September, 2013, 2) attempting to circumvent Aura's exclusive
relationship with its clients and 3) misappropriating Aura's
client list.

Superstation denies the existence of an implied contract on
the grounds that there was no offer, acceptance or consideration
between the parties. <u>See</u> <u>Vadnais</u> v. <u>NSK Steering Sys. Am., Inc.</u>,
675 F. Supp. 2d 205, 207 (D. Mass. 2009) ("the essential
elements of a contract are an offer, acceptance, and an exchange
of consideration or meeting of the minds"). The Court agrees.

Massachusetts law recognizes two causes of action for
implied contract: contract implied-in-fact and contract implied-
in-law. <u>See</u> <u>Massachusetts Eye & Ear Infirmary</u> v. <u>QLT</u>

-10-

Phototherapeutics, Inc., 412 F.3d 215, 229 (1st Cir. 2005). A contract implied-in-fact requires the same elements as an express contract but differs in the method of expressing mutual assent. Id. at 230 (citation omitted). The Court construes plaintiff's implied contract claim to be a claim of contract implied-in-fact. His arguments with respect to a contract implied-in-law are addressed infra, in the analysis of the unjust enrichment claim. See id. at 229.

The Court concludes that there was no valid offer or acceptance to serve as a basis for an implied contract because Superstation never represented to plaintiff that it would continue to do business with him indefinitely. Either party was therefore free to terminate the business relationship "for any reason or for no reason." Butler Corp. v. Gen. Motors Acceptance Corp., 2002 WL 31926852, at *5 (D. Mass. Dec. 27, 2002). Here, Superstation told plaintiff that the reason behind its decision was due, in large part, to the email sent by Ms. Gabriel accusing Cavaignac of being dishonest, unethical and a criminal.

Moreover, neither party gave consideration to create an implied contract to continue their relationship indefinitely. Plaintiff contends that Superstation's apparent satisfaction with his past services and the benefit conferred from the business that plaintiff brought to it serve as consideration. Past consideration, however, does not support the making of a

contract. <u>Greater Boston Cable Corp.</u> v. <u>White Mountain Cable</u>
<u>Const. Corp.</u>, 414 Mass. 76, 80 (1992).  Although Superstation
benefitted from prior dealings, it is undisputed that it
continued to honor existing contracts with Aura's clients and
paid all commissions owed to plaintiff in relation to those
contracts.

The Court perceives no evidence that would allow the
inference that the parties' former transactions served as an
exchange of promises to continue their relationship for an
indefinite period in the future.  An implied-in-fact contract
therefore was not established and either party was free to end
that relationship at will.

Accordingly, defendants' motion for summary judgment with
respect to Count I of plaintiff's complaint will be allowed.

### 2.  Implied covenant of good faith and fair dealing (Count II)

Plaintiff contends that Superstation breached the covenant
of good faith and fair dealing by 1) terminating its
relationship with Aura, 2) attempting to circumvent Aura's
exclusive relationship with its clients, 3) attempting to
misappropriate Aura's client list and 4) defaming Aura.

Under Massachusetts law,

>  the covenant of good faith and fair dealing is implied
>  in every contract...[and] the purpose of the covenant
>  is to guarantee that the parties remain faithful to

the intended and agreed expectations of the parties in
their performance.

Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376,
385 (2004).

As the Court has already determined, however, there was no
implied contract between Gabriel and Superstation. Defendant
therefore could not have breached any derivative covenant of
good faith and fair dealing. Summary judgment with respect to
Count II of the complaint will therefore be allowed.

### 3. Defamation (Count III)

Gabriel contends that Cavaignac defamed him by telling his
clients that he was misappropriating funds from them.

To prevail on a claim for defamation, plaintiff must show
that 1) Cavaignac made a statement concerning the plaintiff to a
third party, 2) the statement had the potential for damaging
plaintiff's reputation in the community, 3) Cavaignac was at
least negligent in making the statement and 4) the statement
either caused the plaintiff economic loss or is actionable
without proof of economic loss. Ravnikar v. Bogojavlensky, 438
Mass. 627, 629-30 (2003). Only statements constituting libel,
charging plaintiff with a crime, alleging certain diseases and
prejudicing plaintiff's profession or business are actionable
without economic loss. Id. at 630. Moreover, a defendant is
"entitled to knowledge of the precise language challenged as

-13-

defamatory." <u>Phantom Touring, Inc.</u> v. <u>Affiliated Publ'ns</u>, 953 F.2d 724, 728 n. 6 (1st Cir. 1992).

Plaintiff testified at his deposition that his defamation claim against Cavaignac was based solely on the March, 2014 affidavit of Maximiliano de Paula ("Mr. de Paula"). That affidavit asserted that in July, 2013, Cavaignac went to Mr. de Paula's restaurant in Hyannis, Massachusetts to offer a new advertising package and to direct him not to deliver checks to Aura because Gabriel was engaging in "speculative ventures."

Mr. de Paula retracted his affidavit, however, at the December, 2014 hearing held before Magistrate Judge Jennifer Boal with respect to defendants' motion for costs related to the non-appearance of Mr. de Paula at scheduled depositions. Through his attorney, Mr. de Paula explained that he signed the affidavit under false pretenses, that the affidavit was incorrect and that he did not appear at his scheduled depositions because Gabriel told him that he did not have to attend. Mr. de Paula subsequently filed a new affidavit in which he elaborated that he signed his initial affidavit in a rush without reading it or asking for a translation because Ms. Gabriel told him to sign it in order to avoid being involved in the instant litigation. He further attests that Cavaignac "never said anything bad to me about [Gabriel] or [Ms.] Gabriel or Aura Video."

Plaintiff now relies on the affidavit of Mr. Laurindo which the Court has declined to strike from the record. Mr. Laurindo states that

> [i]n a business meeting in late spring of 2013 at a restaurant in Boston, [Cavaignac] told us that one of the main reasons he stopped doing business with [Aura], was that they were stealing.

He further asserts that sometime later, when he began working with three clients who had worked with Aura, Cavaignac called to inform him that he would lose the right to represent clients who wished to advertise on TV Globo if he continued to do business with Gabriel. In June, 2014, Cavaignac allegedly ceased business relations with Mr. Laurindo.

As an initial matter, the Court questions the accuracy of the date of the purported business meeting referred to in the affidavit. It is undisputed that Superstation suspended business relations with Gabriel in September, 2013 and therefore Cavaignac could not have told Mr. Laurindo that the relationship had already ended at a meeting held during the spring of 2013.

Notwithstanding that inconsistency and Gabriel's testimony that his defamation claim is based solely on the initial affidavit of Mr. de Paula, Mr. Laurindo's affidavit raises a genuine issue of material fact with respect to plaintiff's defamation claim because defendants have not denied the content

of the submission.  Accordingly, summary judgment with respect
to Count III will be denied.

### 4.    Unjust enrichment (Count IV)

A contract implied-in-law or a quasi contract is

an obligation created by law for reasons of justice,
without any expression of assent and sometimes even
against a clear expression of dissent.

Metro. Life Ins. Co. v. Cotter, 464 Mass. 623, 643 (2013)

(internal quotation and citation omitted).  If a contract

implied-in-law is found to exist, a court may order the

equitable remedy of restitution when a party has been unjustly

enriched at the expense of another. Id.  A plaintiff asserting a

claim for unjust enrichment must establish that the defendant

received a benefit and that, based on the expectations of the

parties, such a benefit was unjust. Id. at 644.

Gabriel claims that defendants have been unjustly enriched

because they misappropriated Aura's confidential client list and

attempted to persuade clients to hire different advertising

agencies.

Plaintiff has contradicted an underlying premise of his

contention, however, by admitting that 1) the identity of

clients seeking to advertise on TV Globo could not be kept

confidential from defendants because the only way to advertise

on that channel in the United States and Canada is through

Superstation and 2) his clients are not contractually bound to

-16-

continue to do business with him but are free to work with any competitor advertising agency.  Not only were defendants aware of those clients, advertisers seeking to run a commercial on TV Globo are also required to sign a contract with Superstation, thereby converting them into mutual clients of the parties.

Moreover, defendants could not have benefitted if an advertiser chose to engage with a different agency because Superstation pays a standard commission to all of its agents and it therefore makes no financial difference to Superstation whether the commission is paid to Aura or to another agency. Even if plaintiff lost some of his former clients, defendants were not beneficiaries as a result.

There is no evidence that defendants were unjustly enriched at plaintiff's expense.  Summary judgment with respect to Count IV will therefore be allowed.

### 5.  Intentional interference with contractual and advantageous business relationships (Count V)

At this stage of the litigation, plaintiff no longer appears to contend that defendants intentionally interfered with existing or prospective contractual relationships.  In any event, it is undisputed that plaintiff did not have exclusive contracts with his clients.  There is also no dispute that defendants fulfilled their obligations under existing contracts with the parties' mutual clients.  The Court will therefore

consider only plaintiff's claim for intentional interference with advantageous business relationships.

That claim requires proof of the following elements: 1) a business relationship or contemplated contract of economic benefit, 2) defendants' knowledge of such relationship, 3) defendants' interference with that relationship through improper motive or means and 4) plaintiff's loss of advantage directly resulting from defendants' conduct. Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992).

To satisfy the improper motive or means element, plaintiff must demonstrate "wrongfulness beyond the interference itself." James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1250 (1st Cir. 1997) (citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816 (1990)). Such improper conduct may be found if a party "used threats, misrepresented any facts [or] defamed anyone." Geltman, 406 Mass. at 817. Proof of actual malice is not required, however, unless the claim is raised by an employee suing an employer in an employment dispute which is inapplicable here. See James L. Miniter Ins. Agency, 112 F.3d at 1250 ("the third element requires merely an improper interference, and not a malicious one"); Blackstone v. Cashman, 448 Mass. 255, 262 (2007) ("We have not rejected the actual malice standard for corporate officials acting with regard to

contractual or prospective contractual relations between the
corporation and its employees.").

Defendants contend that they merely terminated their
relationship with Gabriel and the ramifications of that decision
on plaintiff cannot support his claim.  As defendants have
correctly noted, a refusal to deal does not amount to tortious
interference.  See Spencer Cos., Inc. v. Chase Manhattan Bank,
N.A., 81 B.R. 194, 204 (D. Mass. 1987).

Although Superstation and Cavaignac may have had a sound
business reason for instructing plaintiff's clients that they
would no longer accept new contracts for commercials produced by
Aura, the Court has already concluded that the allegations made
in Mr. Laurindo's affidavit raises a genuine issue of material
fact relating to plaintiff's defamation claim.  Such defamation,
if proven, could constitute improper conduct "beyond the
interference itself." Geltman, 406 Mass. at 816.

Accordingly, summary judgment with respect to plaintiff's
intentional interference with advantageous business
relationships claim will be denied.

### 6.  Violations of M.G.L. c. 93A (Count VI)

Chapter 93A proscribes "unfair methods of competition and
unfair or deceptive acts or practices" by those engaged in trade
or commerce and authorizes a business to sue another for
engaging in such practices. M.G.L. c. 93A §§ 2, 11.  With

respect to disputes in which both parties are sophisticated commercial players, defendants' conduct must reach

> a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.

Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979). To prove a violation of Chapter 93A, plaintiff must therefore show that defendants' conduct

> fell within the penumbra of some established concept of unfairness or was immoral, unethical, oppressive or unscrupulous.

Zurich Am. Ins. Co. v. Watts Regulator Co., 796 F. Supp. 2d 240, 244 (D. Mass. 2011) (internal quotations and citation omitted). Whether a particular set of acts is unfair or deceptive is a question of fact but "the boundaries of what may qualify for consideration as a Chapter 93A violation is a question of law." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 54 (1st Cir. 1998) (citation and internal quotation marks omitted).

The Court concludes that defendants' actions in relation to its decision to terminate business dealings with plaintiff do not constitute an unfair trade practice under Chapter 93A as a matter of law. Plaintiff has made numerous conclusory allegations about defendants' purported deceptive practices but has offered only a scintilla of evidence in the form of Mr. Laurindo's affidavit to support his claim that Cavaignac defamed

him.  Particularly in light of the retraction of the affidavit of Mr. de Paula, plaintiff's evidence is inadequate.

Accordingly, summary judgment with respect to Count VI will be allowed.

## ORDER

In accordance with the foregoing,

1) defendants' motion for summary judgment (Docket No. 156) is, with respect to Counts III and V, **DENIED**, but is otherwise **ALLOWED;** and

2) defendants' motion to strike (Docket No. 174) is **DENIED.**

The case remains pending against defendant Cavaignac with respect to Count III of the complaint (defamation), against defendants Cavaignac and Superstation with respect to Count V of the complaint (intentional interference with advantageous business relationships), against plaintiff Gabriel with respect to all Counts in defendants' counterclaim and against third party plaintiff Ms. Gabriel with respect to all Counts in defendants' third party complaint.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated April 14, 2015